U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

SEP 0 3 2009

TONY R. MOORE, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

PATRICIA ROBERTSON,
    Appellant

CIVIL ACTION
NO. CV08-1967

VERSUS

U.S. Commissioner of Social
Security,
    Appellee

JUDGE JAMES T. TRIMBLE
MAGISTRATE JUDGE JAMES D. KIRK

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Patricia L. Robertson ("Robertson") filed an application for social security disability insurance benefits ("DIB") on December 17, 2004, alleging a disability onset date of December 5, 2004 (Tr. p. 49) due to carpal tunnel syndrome and tendonitis (Tr. p. 57). Robertson's application was denied by the Social Security Administration ("SSA") (Tr. p. 34).

Robertson requested a hearing on May 2, 2005 (Tr. p. 38), which was held on July 26, 2006. The recording of the July 26, 2006, hearing was damaged and could not be duplicated to provide Robertson with a copy (Tr. p. 161). The administrative law judge ("ALJ") issued a decision on August 25, 2006, finding Robertson was not disabled (Tr. pp. 150-157). The Appeals Council vacated the ALJ's decision with orders to the ALJ, on remand, to obtain updated medical records which clearly depict Robertson's limitations, obtain a consultative examination if necessary, evaluate claimant's subjective complaints and provide a rationale for the evaluation of those complaints, obtain evidence from a medical expert if

necessary, reconsider claimant's residual functional capacity with appropriate rationale, and obtain supplemental evidence from a vocational expert if necessary (Tr. pp. 164-165).

A second de novo hearing was held before an administrative law judge ("ALJ") on December 4, 2007, at which Robertson appeared with her attorney and a vocational expert (Tr. p. 260). The ALJ found that, although Robertson has severe impairments of carpal tunnel syndrome, tendonitis, hypertension, anxiety, and depression (Tr. p. 19) and has a limited education, she has the residual functional capacity to perform a limited range of sedentary and light, unskilled work such as usher, cashier, or counter and rental clerk (Tr. p. 27). The ALJ concluded Robertson was not under a disability as defined by the Social Security Act at any time from December 5, 2004, through the date of his decision on January 10, 2008 (Tr. p. 28).

Robertson requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 6) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Robertson next filed this appeal for judicial review of the Commissioner's final decision. Robertson contends on appeal that the ALJ erred in failing to accord proper weight to the opinions of the treating physicians, resulting in an erroneous assessment of Ms. Robertson's residual functional capacity and an improper reliance upon the testimony of the vocational expert to find her not disabled at Step 5. The Commissioner filed a brief in

response, to which Robertson filed a reply.  Robertson's appeal is
now before the court for disposition.

## Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must
meet certain insured status requirements, be under age 65, file an
application for such benefits, and be under a disability as defined
by the Social Security Act.  42 U.S.C. 416(i), 423.  Establishment
of a disability is contingent upon two findings.  First, a
plaintiff must suffer from a medically determinable physical or
mental impairment that can be expected to result in death or that
has lasted or can be expected to last for a continuous period of
not less than 12 months.  42 U.S.C. 423 (d)(1)(A).  Second, the
impairments must render the plaintiff unable to engage in the work
previously performed or in any other substantial gainful employment
that exists in the national economy.  42 U.S.C. 423(d)(2).

## Scope of Review

In considering Social Security appeals such as the one that is
presently before the Court, the Court is limited by 42 U.S.C.
§405(g) to a determination of whether substantial evidence exists
in the record to support the Commissioner's decision and whether
there were any prejudicial legal errors.  McQueen v. Apfel, 168
F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial,
it must be relevant and sufficient for a reasonable mind to support
a conclusion; it must be more than a scintilla but need not be a
preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994),
citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420,

3

1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981). Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

Summary of Pertinent Facts

Robertson was 42 years old at the time of her December 2007 hearing (Tr. p. 264), had an eleventh grade education (Tr. p. 265), and had past relevant work as a baker and manager at a Great

4

American Cookie Company store (1995-2004) and working in a Dairy Queen (Tr. p. 65-66, 266, 268).

## 1. Medical Records

In August 2003, Dr. Gerard T. Gabel performed a carpal tunnel release on Robertson's right hand (Tr. pp. 239-241). In October 2003, Robertson underwent an open carpal tunnel release to treat her left side carpal tunnel syndrome and debridement of her left lateral epicondylitis ("tennis elbow") by Dr. Gabel (Tr. pp. 186-187, 230-235). In March 2004, Dr. Gabel performed a debridement for her right lateral epicondylitis (Tr. pp. 220-221). In September 2004, Dr. Gabel noted Robertson's continued complaints of left elbow pain, good range of motion in both elbows (lacking about five degrees extension at each elbow), and found she was at maximum medical improvement with a 2% impairment of the upper extremity for both sides, which resulted in a 2% total body impairment (Tr. p. 83).

In March and April 2004, Dr. Craig V. Broussard, an internist, treated Robertson for hypertension and allergic rhinitis, and noted her prior surgeries (Tr. pp. 131-132). In April 2004, Dr. Broussard noted that Robertson was taking Atacand, Toprol, and Lexapro, and that her hypertension was well controlled (Tr. p. 131). In August 2004, Dr. Broussard prescribed Lexapro for her hypertension and diagnosed dysthymia/anxiety due to stress and illness in her family (Tr. p. 130). In December 2004, Robertson's hypertension was under "excellent control," she had some bouts of numbness and tingling of the arm, and she still had anxiety and

5

depression (Tr. pp. 124-125). In November 2004, Dr. Broussard gave Robertson a gynecological exam (Tr. pp. 126-127). In December 2004, Dr. Broussard gave Robertson a general exam, did not find any problems with her wrists of forearms, noted Robertson was depressed and anxious about her mother's kidney cancer, and found her hypertension was under excellent control (Tr. pp. 124-125). In April 2005, Dr. Broussard noted Robertson's complaints of elbow pain "off and on" when the weather changed, found improvement since her ulnar release which had not yet completely healed, and noted her stress and dysthymia due to the death of her mother (Tr. p. 121). In August through October 2005, Dr. Broussard continued to treat Robertson for her hypertension and anxiety, as well as a gynecological exam (Tr. pp. 119-120). In December 2005, Dr. Broussard gave Robertson another general exam, did not find any problems with her extremities, found no problems with her grip strength, and she had a negative Tinel sign and mildly diminished sensation to gross touch; otherwise her hypertension was controlled and Dr. Broussard diagnosed anxiety and depression without any stated reason (Tr. pp. 113-118). In March and June 2006, Dr. Robertson treated Robertson for hypertension, restless leg syndrome, and anxiety/depression due to stress and her aunt's recently diagnosed cancer; Dr. Robertson recommended a psychological consult and counseling (Tr. pp. 111-112). In May 2007, Dr. Broussard gave Robertson a gynecological exam (Tr. pp. 192-197).

In February 2005, Dr. Christina Levings, an internist,

6

evaluated Robertson for disability (Tr. p. 99). Dr. Levings noted Robertson was 65" tall, weighed 222 pounds, and complained of carpal tunnel syndrome and tendonitis, previous right and left carpal tunnel releases in 2003, surgery on her left elbow in 2003 and a right elbow fasciotomy with partial ostectomy in 2004 (Tr. p. 99). Robertson also complained of persistent, sharp, pulling pain in her left elbow which impaired her ability to drive, and numbness in her right fingertips (Tr. p. 99). Dr. Levings stated that Robertson has the functional capacity to dress herself, feed herself, stand for about six hours at a time, walk about 60 feet in one minute, sit for eight hours, lift two to five pounds maximum, drive a car for about 30 minutes, and can sweep, mop, vacuum, climb stairs slowly, cook, shop with assistance, and use a dishwasher (Tr. p. 100). Dr. Levings noted that Robertson had diminished sensation at her right fingertips, a 4/5 grip in her left hand and could not hold a grip for long due to left elbow pain, but otherwise everything appeared to be normal (Tr. pp. 100-101). Dr. Levings concluded that Robertson's carpal tunnel syndrome and tendonitis caused a mild decrease in Robertson's grip strength on the left and pain in her left elbow during range of motion exercises, resulting in a mild functional limitation (Tr. p. 101).

In January 2006, an electromyography by Dr. Thomas B. Ford, an orthopedic surgeon, showed persistent bilateral carpal tunnel syndrome involving the motor and sensory fibers, slightly more marked on the right than on the left (Tr. pp. 136-137, 143-144). Dr. Ford noted that Robertson was not ready for further surgery or

injections at that time (Tr. p. 134).

In September 2006, Dr. Gabel examined Robertson again, reviewed the EMG results from January, and noted persistent numbness and tingling in her right hand and a positive nerve compression test over the median nerve and the radial styloid (Tr. p. 202). Dr. Gabel diagnosed recurrent neurologic symptoms in her right hand and gave her an injection and a wrist splint to wear for a month (Tr. p. 202). When that treatment did not help, Dr. Gabel stated that the lack of response to the injection mitigated against a recurrence of the carpal tunnel syndrome as the source of her neurologic symptoms, but noted the carpal tunnel was implicated because the symptoms were somewhat diffuse in her hand but tended toward the median nerve; her ulnar nerve at the elbow was clean and her neck did not demonstrate any findings (Tr. p. 201). Dr. Gabel stated there did not appear to be any other source of Robertson's neurologic symptoms, so he recommended following her to see if the median nerve symptoms resolved (Tr. p. 201). Although a revision procedure would not be beneficial at that time, a revision procedure might become appropriate if Robertson's median nerve symptoms did not resolve (Tr. p. 201).

In October 2007, Dr. Broussard noted that Robertson was taking Toprol, Atacand, Clonazepam, Effexor, and Ultracet for her hypertension, carpal tunnel syndrome, anxiety, and depression (Tr. pp. 191-193). Dr. Broussard filled out a form for Robertson's "ability to do work-related activities (physical)," indicating she can occasionally (up to 1/3 of the time) lift/carry up to ten

8

pounds and "seldom" (an undefined place between "never" and "occasionally") lift/carry up to 20 pounds (Tr. p. 176), she can sit, stand or walk up to eight hours in an eight hour day (Tr. p. 177), she can occasionally (up to 1/3 of the time) reach, handle, finger, feel, push or pull with either hand, she can continuously (over 2/3 of the time) operate foot controls with either foot (Tr. p. 178), she has no postural limitations, she can only occasionally (up to 1/3 of the time) work around moving mechanical parts or moving equipment (Tr. p. 179), and she needs to take an unscheduled break during a work day three to four times per day for about 20 minutes due to pain and fatigue caused by residual carpal and ulnar tunnel syndrome (Tr. p. 180). Dr. Broussard also noted that Robertson has a difficult time using her upper extremities, especially her forearms and grips (Tr. p. 180).

## 2. Administrative Hearing

At her December 2007 administrative hearing, Robertson testified that she was 42 years old, married, had two grown children and one grandchild, and lived with her husband and one of her children (Tr. pp. 26-265). Robertson completed the eleventh grade, did not graduate from high school, and did not earn a GED (Tr. p. 265). Robertson testified that she did not have any income other than her husband's income (Tr. p. 266).

Robertson last worked in December 2004 as a baker and store manager (Tr. p. 266). Robertson testified that, when the bakery was sold, she was laid off because she was unable to scoop cookies, squeeze the icing bags to decorate cakes, or lift and take cookies

out of the oven. Robertson testified that carpal tunnel syndrome in both hands and tendonitis in both elbows prevented her from working in the bakery (Tr. p. 267). Robertson testified that, prior to working in the bakery, she worked at a Dairy Queen for two years as a cook, crew leader, and manager (Tr. p. 268).

Robertson began having problems with her right hand in 2002 and went to see a doctor; her left hand started bothering her later (Tr. pp. 269, 287). Robertson had surgery on both hands and elbows in 2003 and 2004 (Tr. p. 270). Robertson testified that, since her surgery, the fingertips on her right hand are almost always numb (Tr. p. 291), her right hand has frequent numbness, tingling, and sometimes pain (Tr. pp. 269-271, 290), her left elbow has a lot of "pulling" pain, and her left hand goes to sleep (Tr. pp. 270, 294-295). Robertson wears braces at night to keep her hands from going to sleep; her left hand does so more than her right hand (Tr. p. 270). Robertson testified that she takes Ultracet for pain (Tr. p. 271). Robertson tried taking shots, but they never helped (Tr. p. 274). Robertson testified that, when she last saw her surgeon, Dr. Gabel, a year ago, he told her she did not need surgery again (Tr. p. 272).

Robertson testified that she is right-handed and her right hand is worse than her left (Tr. p. 290). Cold or rainy weather affects her hands, and her hand problems affect her ability to write (Tr. p. 291). The numbness in the fingertips of her right hand affects her ability to quickly feel pain, heat, or cold, so she can't feel a hot pot right away (Tr. pp. 292-293); her left

10

hand has more feeling (Tr. p. 293). If Robertson keeps her hands still, they start getting numb and tingling, but if Robertson uses her hands very long, they start having sharp pains (Tr. p. 293). Robertson testified that she finds it easier to hold larger things than to hold smaller things (Tr. p. 294).

Robertson testified that she has numbness in her forearms to her elbows and her right elbow is worse than her left (Tr. p. 295); she has trouble pushing and pulling with her arms, so she cannot push a grocery cart (Tr. p. 295). Robertson testified that she does not have any problems with sitting, standing, or walking, but she cannot lift more than ten pounds (Tr. p. 275).

Robertson testified that, on a typical day, she gets up and makes coffee, then she sits in her recliner and watches TV (Tr. pp. 277-278). Some days she visits her daughter (Tr. p. 277). Robertson testified that she does not have any hobbies or interests and does not email (Tr. p. 278). Robertson testified that her husband and son lift things for her, her husband does the laundry, her son takes out the trash, and Robertson vacuums (Tr. p. 279). Robertson testified that she cannot work because she is so restricted in what she can do (Tr. p. 280).

Robertson testified that she also suffers from depression, for which she takes medication; some days she does not function very well due to depression (Tr. p. 276). Robertson testified that her depression has caused her to be less active inside and outside her home, to socialize less, and to have crying spells about three times a week (Tr. pp. 296-298).

Robertson testified that, when she worked at the cookie store, she baked cookies, waited on customers, operated the cash register, and made change (Tr. p. 183). Robertson testified that the cookie dough came premixed in a thirty pound box, which she scooped onto trays and baked (Tr. pp. 283-284). During a typical day, Robertson had to lift and carry a thirty pound box fifteen or more times because they had fifteen kinds of cookie dough (Tr. pp. 293-284). Robertson testified that each cookie tray weighed 3.63 pounds (Tr. p. 284). Robertson also placed orders for supplies once a week, scheduled employees and put their in the computer, oversaw their work, and reported any employee problems to her boss (Tr. pp. 285-286). Robertson testified that about 85 percent of her job was physical work and 15 percent was paperwork (Tr. p. 286). Robertson testified that, during the two year period when she was undergoing surgeries and recovering from them, she was limited in what she could do, but the store owner had other employees assist her (Tr. pp. 288-289). The new store owners let Robertson go because she was unable to do all of her work (Tr. p. 289).

Robertson testified that, when she was an assistant manager at Dairy Queen, 90 percent of her job was physical labor such as lifting and carrying boxes, and ten percent of her job was paper work (Tr. pp. 289-290).

The vocational expert ("VE") testified that Robertson's past work at the Great American Cookie Company and at Dairy Queen was skilled, medium duty work (Tr. p. 299), but that her work at the Cookie Company could also be classified as falling in the low range

12

of heavy duty work (Tr. p. 304).

The ALJ posed a hypothetical question concerning a younger individual with an eleventh grade education, the ability to lift ten pounds occasionally and five pounds frequently, who can sit, stand, or walk six hours in eight, can push and pull, has normal lower extremities, normal grip strength and range of motion on the right upper extremity, and in the left upper extremity there is a 4/5 grip strength, a normal range of motion, a mild gross touch limitation, a limitation in any long sustained gripping, and an overall mild functional limitation, cannot work around heavy equipment or dangerous equipment, can climb stairs, cannot climb ladders, ropes or scaffolds, cannot run, can bend, stoop, crouch, crawl, squat, balance and twist, and has the ability to get along with others, understand simple instructions, concentrate, perform simple tasks, and respond and adapt to workplace changes and supervision (Tr. pp. 299-300).

The VE testified that such an individual could not perform Robertson's past relevant work, but could perform work such as usher, lobby attendant or ticket taker (unskilled, light duty, 1900 jobs in Louisiana, 109,000 jobs nationally), cashier (light duty, unskilled, 18,000 jobs in Louisiana, 1,100,000 jobs nationally), or counter and rental clerk (light duty, unskilled, 1800 jobs in Louisiana, 148,000 jobs nationally) (Tr. p. 301). The VE testified that these are light duty jobs that do not require lifting more than ten pounds occasionally (Tr. p. 301).

The VE further testified that the hypothetical posed by the

13

ALJ did not include any limitations on fingering or manipulating (Tr. p. 304). The VE testified that crawling requires the use of the hands to get up, and that bending, squatting and crawling could require the use of the upper extremities (Tr. p. 305). The VE testified that the job of usher, lobby attendant and ticket taker is theater work, that ticket takers have to manipulate small pieces of paper, and lobby attendants may have some janitorial duties which are in the light to medium duty range (Tr. pp. 107-108). The VE testified that the jobs of cashier or counter and rental clerk require fine manipulation to handle money, do paperwork, and use a pen, pencil, or electronic equipment (Tr. pp. 306-307).

Robertson modified the ALJ's hypothetical by adding a limitation of only occasional (up to 1/3 of a work day, or two to three hours intermittently) gripping, fine or gross manipulation, and fingering (Tr. p. 307). The VE testified that such a restriction would eliminate all cashier jobs, nineteen of twenty counter and rental clerk jobs, and one-third to one-half of the usher, ticket taker, and lobby attendant jobs (Tr. pp. 308-309). When Robertson added a second modification to the ALJ's hypothetical, to include three to four unscheduled twenty minute breaks per day due to pain and fatigue, the VE testified there would not be any jobs such a person could do (Tr. p. 310). In response to the addition of a moderate restriction on the ability to deal with the public on a consistent basis, the VE testified that restriction would eliminate the jobs of usher and lobby attendant (Tr. p. 310).

14

## ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Robertson (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Robertson has not engaged in substantial gainful activity since December 5, 2004, and she has severe impairments of carpal tunnel syndrome, tendonitis,

hypertension, anxiety, and depression, but she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 19). The ALJ also found that Robertson is unable to perform her past relevant work as a manager and a cook (Tr. p. 26).

At Step No. 5 of the sequential process, the ALJ further found that Robertson has the residual functional capacity to lift/carry 5 pounds frequently and 10 pounds occasionally, sit, stand and walk up to 6 hours in an eight hour day, cannot perform any long, sustained gripping with her left hand and has mild functional limitations in her left upper extremity, cannot operate dangerous or heavy equipment, cannot run, cannot climb ladders, ropes and scaffolds, can push/pull with her lower extremities, has a normal range of motion in her hands, wrists and elbows, can climb stairs, bend, stoop, crouch, crawl, balance, and twist, and can get along with others, understand simple instructions, concentrate on and perform simple tasks, and respond and adapt to workplace changes and supervision (Tr. p. 21). The ALJ also found that the claimant is a younger individual with a limited education (Tr. pp. 27). The ALJ concluded there are a significant number of jobs in the national economy which Robertson can perform, such as usher, cashier, and counter and rental clerk and, therefore, Robertson was not under a "disability" as defined in the Social Security Act at any time from December 5, 2004, through the date of the ALJ's decision on January 10, 2008 (Tr. pp. 27-28).

16

motor and sensory fibers, with the right side slightly more marked than the left (Tr. pp. 136-137, 143-144). In September 2006, Dr. Gabel found a positive Tinel's sign[2] over the median nerve of the right hand and a positive nerve compression test of the median nerve and the radial styloid, and diagnosed recurrent neurologic symptoms in her right hand (Tr. p. 202). In a residual function capacity assessment in October 2007, Dr. Broussard stated that Robertson has a difficult time using both upper extremities, especially the forearm and grip (Tr. p. 180).

Robertson's burden was to prove that she was disabled within the meaning of the Social Security Act. That requirement means that she must show a "medically determinable" impairment and that she is unable "to engage in substantial gainful activity". Greenspan v. Shalala, 38 F.3d 232 (5th Cir. 1994), cert. den., 514 U.S. 1120, 115 S.Ct. 1984 (1995); 20 C.F.R. §423(d)(1)(A) and (d)(3); 20 C.F.R. §404.1508; 42 U.S.C. §423(d)(1)(A).

Although the evidence shows that Robertson has problems with her wrists and forearms, it does not show that Robertson's impairments preclude all work-related activity. Robertson declined treatment from Dr. Ford in January 2006 (Tr. p. 134). The ALJ noted that after Robertson's treating surgeon, Dr. Gabel, examined Robertson in September 2006, he gave her an injection in the right

_____

[2] In diagnosing carpal tunnel syndrome, "tapping over the median nerve at the wrist may cause pain to shoot from the wrist to the hand. This is called Tinel's sign." MEDLINEplus Health Information, Medical Encyclopedia: Carpal Tunnel Syndrome, available at http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

motor and sensory fibers, with the right side slightly more marked than the left (Tr. pp. 136-137, 143-144). In September 2006, Dr. Gabel found a positive Tinel's sign[2] over the median nerve of the right hand and a positive nerve compression test of the median nerve and the radial styloid, and diagnosed recurrent neurologic symptoms in her right hand (Tr. p. 202). In a residual function capacity assessment in October 2007, Dr. Broussard stated that Robertson has a difficult time using both upper extremities, especially the forearm and grip (Tr. p. 180).

Robertson's burden was to prove that she was disabled within the meaning of the Social Security Act. That requirement means that she must show a "medically determinable" impairment and that she is unable "to engage in substantial gainful activity". Greenspan v. Shalala, 38 F.3d 232 (5th Cir. 1994), cert. den., 514 U.S. 1120, 115 S.Ct. 1984 (1995); 20 C.F.R. §423(d)(1)(A) and (d)(3); 20 C.F.R. §404.1508; 42 U.S.C. §423(d)(1)(A).

Although the evidence shows that Robertson has problems with her wrists and forearms, it does not show that Robertson's impairments preclude all work-related activity. Robertson declined treatment from Dr. Ford in January 2006 (Tr. p. 134). The ALJ noted that after Robertson's treating surgeon, Dr. Gabel, examined Robertson in September 2006, he gave her an injection in the right

_____

[2] In diagnosing carpal tunnel syndrome, "tapping over the median nerve at the wrist may cause pain to shoot from the wrist to the hand. This is called Tinel's sign." MEDLINEplus Health Information, Medical Encyclopedia: Carpal Tunnel Syndrome, *available at* http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

carpal tunnel for both diagnostic and therapeutic reasons (Tr. p. 202). A month later, Dr. Gabel noted that her injection had not had any response whatsoever, which tended to indicate that her carpal tunnel had not recurred and was not the source of her neurologic symptoms (Tr. p. 201). Dr. Gabel further found that Robertson's symptoms were somewhat diffuse in her hand, but tended towards the median nerve distribution, which did tend to implicate the carpal tunnel and stated there did not appear to be any other source of her symptoms, since the ulnar nerve at the elbow looked clean and her neck was negative for findings (Tr. p. 201). Dr. Gabel recommended following up on Robertson's symptoms and, if the median nerve symptoms did not resolve, then a revision procedure might be appropriate (Tr. p. 201). There are no subsequent medical records from Dr. Gabel.

Therefore, in October 2006, Dr. Gabel was unable to state conclusively whether Robertson's carpal tunnel had returned, and never identified the problem she was having with her wrists and forearms. There are no subsequent diagnostic medical records concerning her carpal tunnel syndrome from Dr. Gabel or any other doctor. Dr. Broussard gave Robertson a gynecological exam in May 2007 (Tr. pp. 181-182), and filled out a residual functional capacity evaluation form for her in October 2007, but clearly deferred to Dr. Gabel as to Robertson's problems with her wrists and forearms, and relied on Robertson's own statements as to the continued existence of carpal tunnel syndrome (Tr. pp. 176-180). Hence, Dr. Broussard's statement in his 2007 assessment of

19

Robertson's ability to do work activities, that Robertson needs to take an unscheduled twenty minute break three to four times per work day due to pain and fatigue caused by *residual carpal and ulnar tunnel syndrome,* is unsupported by the medical evidence. Dr. Gabel did not conclusively diagnose carpal tunnel syndrome, and no doctor found ulnar tunnel syndrome persisting after the surgeries. Dr. Broussard did not examine Robertson when he filled out the residual functional capacity assessment, nor did he ever treat her for her carpal tunnel syndrome, ulnar syndrome, or any other symptoms with her wrists and forearms. The weight to be given a physician's statement is dependent upon the extent it is supported by specific clinical findings. Elzy v. Railroad Retirement Board, 782 F.2d 1223, 1225 (5th Cir. 1986); Jones v. Heckler, 702 F.2d 616, 621 (5th Cir. 1983); Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981).

Dr. Levings made a comprehensive examination and evaluation of Robertson in February 2005, including an assessment of Robertson's grip strength (Tr. pp. 99-101). The ALJ relied on Dr. Levings' evaluation of Robertson rather than on Dr. Broussard's, stating correctly that the limitations imposed by Dr. Broussard due to Robertson's forearm and wrist problems are not supported by the medical evidence (Tr. p. 26). Therefore, the ALJ did not clearly err in relying on Dr. Levings' evaluation rather than on Dr. Broussard's.

Robertson also contends the ALJ erred in relying on the evaluation of a consultative, non-treating physician, Dr. Levings,

20

over that of a treating physician, Dr. Broussard. Generally, the opinion of a treating physician deserves to be given greater weight than that of a non-treating or consulting physician. Carry v. Heckler, 750 F.2d 479, 484 (5th Cir. 1985). In the case at bar, it is clear that Dr. Broussard did not treat Robertson's wrist and forearm problems - Dr. Gabel did. Since neither Dr. Levings nor Dr. Broussard was the treating physician for Robertson's carpal tunnel syndrome and ulnar tunnel syndrome, neither evaluation is entitled to more weight than the other on that basis.

Finally, Robertson contends that Dr. Ford found evidence of probable bilateral carpal tunnel syndrome which was consistent with Dr. Gabel's positive findings, although Dr. Gabel did not conclude the symptoms were definitely from carpal tunnel syndrome. However, Dr. Ford's findings do not avail Robertson, since he did not state that her symptoms were to a degree that precluded her from working. It is also noteworthy that Robertson refused treatment from Dr. Ford.

This issue is meritless.

## 2. Mental Limitations

Finally, Robertson contends the ALJ erred in finding she has moderate difficulties in concentration, persistence, or pace due to anxiety and depression, since there is not medical evidence to support that finding. Robertson also argues, that, because the ALJ found she has moderate difficulties in concentration, persistence, or pace due to anxiety and depression, he erred in failing to find her anxiety and depression caused a "significant limitation" in

21

understanding, concentrating, and performing tasks.

As pointed out by Robertson, there are no evaluations or other treatment by mental health professionals in the record. Robertson simply received anti-depressant and anti-anxiety medications from Dr. Broussard to help her through various stressful events in her life. Although a psychological exam and counseling were recommended by Dr. Broussard, Robertson apparently did not find it necessary to do those things. However, to the extent the ALJ may have erred in finding she has moderate difficulties in concentration, persistence, or pace due to anxiety and depression,[3] that error does not avail Robertson. The removal of a functional limitation simply broadens the range of jobs available to the claimant and, therefore, does aid Robertson in proving there is no work which she is able to perform.

Moreover, since there is no evidence from a mental health professional to support the ALJ's finding that Robertson suffers from depression and anxiety which cause her moderate difficulties in concentration, persistence, or pace, the ALJ did not err in failing to find she has a significant limitation in understanding, concentrating, and performing tasks.

Finally, it is noted that, although the ALJ has the discretion to order a consultative examination, the claimant has the burden of proof in establishing a disability. An examination at government expense is not required unless the record establishes that such an

---

[3] ALJ's have been warned by the courts against "playing doctor" and making their own independent medical assessments. Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2002).

examination is necessary to enable the ALJ to make the disability decision. <u>Anderson v. Bowen</u>, 887 F.2d 630, 634 (5th Cir. 1989). Also, <u>Brock v. Chater</u>, 84 F.3d 726 (5th Cir. 1996); <u>Wren v. Sullivan</u>, 925 F.2d 123, 127 (5th Cir. 1991); <u>Haywood v. Sullivan</u>, 888 F.2d 1463, 1472 (5th Cir. 1989). Robertson did not claim disability due to depression or anxiety, she never availed herself of a previous opportunity to obtain psychological evaluation and counseling, and she did not request a consultative psychological examination from the ALJ before or during her hearing, despite the fact that she was represented by counsel. Since the administrative record does not indicate that a consultative psychological examination was necessary, the ALJ did not abuse his discretion in not ordering a psychological evaluation.

This issue is meritless.

### 3. Occupational Clusters

Finally, Robertson contends the ALJ erred in utilizing occupational clusters of jobs without providing Dictionary of Occupational Title ("DOT") numbers, and that, after one-third to one-half of the jobs in usher/ticket taker/lobby attendant job cluster are eliminated due to manipulative limitations, it is unknown how many jobs remained.

Robertson asked the VE to include a limitation for only "occasional" handling, feeling, and fingering, which the VE testified would eliminate one-third to one-half of the jobs, but did not give any specific numbers. However, the ALJ did not assign any limitations for fingering or manipulating, but only gave a grip

strength of 4/5 on the left, a mild gross touch limitation, and an overall mild functional limitation on the left. Robertson's additional limitations as to fingering and manipulating are based on Dr. Broussard's evaluation, which was not supported by the medical evidence and was rejected by the ALJ. Therefore, the issue of how many jobs would remain is moot.

This issue is meritless.

### 4. Conclusion

Substantial evidence supports the ALJ's finding that there is work existing in significant numbers in the state and national economies which Robertson can perform despite her impairments. Therefore, Robertson's appeal should be denied.

### Recommendation

Based on the foregoing discussion, IT IS RECOMMENDED that Robertson's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT**

WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 3rd day of September, 2009.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE